UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| v.  ) | Crim. No. 5-27-B-W |
| ) | |
| ARTHUR MICHAEL KINSELLA, ) | |
| ) | |
| Defendant. ) | |

**RECOMMENDED DECISION**

Arthur Kinsella, under indictment for conspiracy with the intent to distribute oxycodone and unlawful possession of oxycodone and failure to appear for court proceedings, has filed a motion to suppress any physical evidence obtained as a result of the search and seizure of Kinsella's person, the car he was driving, or any packages or containers contained therein on March 19, 2005.  (Def.'s Mot. to Suppress, Doc. No. 83.)  Kinsella claims his Fourth Amendment rights were violated because the search was conducted without a warrant and the search of the automobile was without probable cause, reasonable suspicion, or valid consent and under no exigent circumstances.  I now recommend the court adopt the following proposed findings of fact and deny the motion.

**PROPOSED FINDINGS OF FACT**

Frederick Luce, a Brewer police detective who works as a task force agent (TFA) with the Maine Drug Enforcement Agency Task Force, became involved in a narcotics investigation involving Greg Panther and Richard Hopkins in 2004.  Panther had been distributing Oxycontin pills manufactured in Canada.  The Task Force was able to confirm the Oxycontin pills distributed by Panther were manufactured in Canada because of the pills' distinctive appearance, including the letters "cdn" that appear on one side of the pills.  In the course of the investigation,

Richard Hopkins became a confidential informant for the Task Force. Hopkins identified his source of supply as Christopher Long, someone Hopkins reported meeting at an off-track betting facility in Bangor. "Long" told Hopkins that the source of his Oxycontin pills was a Canadian citizen. Through subsequent investigation, TFA Luce came to learn that Christopher Long's true name was Christopher Hitchcock. On December 21, 2004, Hopkins cooperated with the Task Force to arrange a controlled oxycodone purchase from Hitchcock. Task force agents monitored a phone call between Hopkins and Hitchcock to set up the deal and they were able to monitor the transaction using a wire and visual surveillance. The agents allowed the deal to be consummated without an arrest, but recovered the pills from Hopkins and were able to identify them as Oxycontin pills having a Canadian origin.

In February 2005, Christopher Hitchcock was arrested for his involvement in the December 21 controlled buy. Following his arrest, Hitchcock told law enforcement personnel that he had obtained the Oxycontin pills from Mike Kinsella and that he had participated in more than one such transaction. Hitchcock confirmed that the December transaction took place after a telephone call he had with Hopkins. He reported that, after speaking with Hopkins on the telephone, he called Kinsella and arranged for the delivery of 90 Oxycontin pills. Kinsella delivered the pills to Hitchcock and Hitchcock delivered them to Hopkins. Hitchcock provided the police with Kinsella's cell phone number and with the description of a green minivan with New Brunswick plates that Hitchcock said Kinsella drove. Hitchcock described how they would arrange their transactions, which were set up at either the racetrack or an off-track betting establishment in Bangor. Hitchcock said he would get the pills from Kinsella inside the establishment, exchange them for cash with a buyer, and then return to Kinsella and give him the cash in exchange for a currier's fee. When shown a photocopy of a photograph taken from

Kinsella's Canadian license (presumably furnished by the Royal Canadian Mounted Police, or "RCMP"), Hitchcock was unable to identify Kinsella as his source of Canadian drugs.

Using the information supplied by Hitchcock, including Kinsella's phone number,[1] DEA Agent Zawadzki coordinated with the RCMP regarding the Canadian source of the pills. The RCMP told the Task Force that the phone number provided by Hitchcock was known to be associated with Arthur Kinsella, though it was not registered to him, and the RMCP also provided the Task Force with the New Brunswick license plate number GKK367 for a green minivan also known to be associated with Kinsella. Zawadzki also coordinated with United States Customs Agent Phil Riherd in order to arrange for notification if the green minivan with the identified plate number entered the United States. Zawadzki was also able to learn that this vehicle had entered the United States at the Milltown Port of Entry on December 21, 2004, the date of the controlled buy that netted Hitchcock.

In March 2005, Hitchcock, acting at the behest of TFA Luce, made a series of calls to Kinsella to set up a delivery of 90 to 100 Oxycontin pills at a price of $34.00 (U.S.) per pill. Most of these calls were monitored and recorded by Task Force agents. All the monitored calls were placed by Hitchcock to Kinsella at the telephone number previously identified as Kinsella's, (506) xxx-xxxx. As a result of these calls, Hitchcock and Kinsella arranged for a

---

[1] During his testimony, DEA Agent Zawadzki stated that prior to Hitchcock's arrest, the Task Force had already identified Mike Kinsella as a suspect because a "toll analysis" of Hitchcock's cell phone included the same phone number associated with Kinsella. Agent Zawadzki stated that the cell phone information was obtained by means of an administrative subpoena and that Kinsella's association with the phone was indicated by RCMP personnel.
    Defense counsel learned about the administrative subpoena for the first time at the hearing and she claims that use of this administrative subpoena was illegal. While it sounded to me like the sort of non-content telephone information obtainable by means of an administrative subpoena pursuant to 18 U.S.C. § 2703(c) (2), the Government conceded for the purposes of the probable cause analysis on this motion that the court need not consider the additional corroboration furnished by the toll records and could rely upon the fact that Hitchcock later told them of Kinsella and supplied Kinsella's phone number. I have limited the proposed findings of fact as suggested by the Government.

delivery at 8:00 p.m. EST on March 19, 2005, at "BK"[2] in Bangor, Maine.  During the final call arranging the details of the meeting, Kinsella informed Hitchcock that he would be leaving his location at 6:00 p.m. AST and would arrive in four hours, which would have been 9:00 p.m. EST, due to the change in time zones.

At approximately 6:15 p.m., a customs officer notified the Task Force agents that a vehicle bearing New Brunswick plate number GKK367 had just entered the United States at the Milltown Port of Entry.  At approximately 7:47 p.m., at the request of the Task Force, Corporal David Lord of the Brewer Police Department initiated a traffic stop of a green 1999 Dodge Caravan with New Brunswick license plate number GKK367.  Prior to the stop, TFA Luce advised Corporal Lord that Arthur Michael Kinsella was believed to be operating the vehicle and would be in possession of a large quantity of Oxycontin pills.  In addition to this information, Corporal Lord observed the vehicle traveling only one car length behind the vehicle in front of it.  Considering the speed at which the vehicles were traveling (estimated to be 45 mph), Corporal Lord concluded he would have been justified to stop the vehicle for following too closely, although he also testified that it was his intention to stop the vehicle regardless of any traffic infraction.

Prior to the stop, Corporal Lord observed that there was a passenger in the vehicle.  At some point during the stop Lord observed that the passenger was an elderly woman later identified as Kinsella's mother.  Upon Corporal Lord's request, the driver of the vehicle produced a New Brunswick driver's license in the name of Arthur Michael Kinsella.  Kinsella and his mother indicated that they were on their way to the airport to pick up a family member.  Corporal Lord returned to his vehicle with this information and Kinsella's license.  Corporal Lord

---

[2]  Hitchcock informed the agents that BK referred to the Burger King then located on Main Street in Bangor, in close proximity to the Bangor racetrack.

4

then returned to the vehicle, returned the license, and asked Kinsella to step out of the vehicle. Kinsella complied. Corporal Lord asked Kinsella if he had any weapons or unlawful drugs in the vehicle, to which Kinsella responded that he did not. Corporal Lord then asked Kinsella for permission to search his person and the vehicle and Kinsella voiced his consent to both requests. Lord placed Kinsella behind the van while he conducted his search of the vehicle.

During the search of the vehicle, Corporal Lord found a small zippered bag located between the front seats. Inside this bag, Lord discovered a prescription bottle with a label stating:

> Michael Kinsella
> Take One Tablet(s) Four Times Daily
> Oxycontin 80mg
> Oxycodone HCL 80 mg
> 120 TAB
> 14-MAR-05

Also inside the bag were credit cards, a vehicle registration, and miscellaneous documents. The documents and credit cards found in the bag were in the name of Judith Kinsella. A cellular phone also was recovered from the van. The cell phone corresponded to the telephone number dialed by Hitchcock when he made the telephone conversations described previously. As a result of recovering the pills from the vehicle and the calls previously recorded, the agents arrested Kinsella.

Agent Zawadzki and Agent Riherd were present at the scene of the stop, arriving within moments of the stop. However, they remained approximately 15 yards behind the police cruiser until after Corporal Lord recovered the drugs, at which time they drove forward and exited the vehicle. Agent Zawadzki got out of his vehicle and walked forward and stood beside Kinsella, who was standing between the van and Lord's police cruiser. Corporal Lord allowed that no

5

ticket or warning was ever given for following too closely and that Kinsella was never informed that he was free to go.

## DISCUSSION

Relying upon the Fourth Amendment to the United States Constitution, Kinsella seeks to suppress all physical evidence seized on March 19, 2005, during the warrantless searches of his person,[3] the vehicle he was driving, and any packages or containers found therein. Kinsella claims the search was conducted without probable cause, without valid consent, and in the absence of exigent circumstances.

A.   The initial stop of the motor vehicle was lawful.

The initial traffic stop of a motor vehicle must be supported, at a minimum, by a reasonable and articulable suspicion of criminal activity. Delaware v. Prouse, 440 U.S. 648 (1979). In this case the Government justifies the traffic stop on two separate grounds: the minor traffic infraction of following too closely and the reasonable suspicion that Kinsella was engaged in narcotics trafficking. The traffic infraction would be a legally sufficient reason for the stop of the vehicle, if Corporal Lord's testimony regarding what he observed is accepted as credible. I do accept it as credible and therefore find that the traffic stop was justified at its inception. The fact that Corporal Lord would have made the stop anyway, as he was instructed to do, does not mean that the minor traffic infraction cannot justify stopping the vehicle. Whren v. United States, 517 U.S. 806, 812-13 (holding that the reasonableness of a traffic stop does not depend on an individual officer's subjective motivations; that the Government need not establish that the officer would have made the stop in the absence of an ulterior motive).

---

[3]   There is no indication that incriminating evidence was obtained from a search of Kinsella's person.

However, even if one did not accept Corporal Lord's testimony about Kinsella following another vehicle too closely, the facts and circumstances collectively known by the investigating officers certainly gave rise to a reasonable and articulable suspicion that criminal activity was afoot.

> Reasonable suspicion, as the term implies, requires more than a naked hunch that a particular person may be engaged in some illicit activity. By the same token, however, reasonable suspicion does not require either probable cause or evidence of a direct connection linking the suspect to the suspected crime. Reasonable suspicion, then, is an intermediate standard - and one that defies precise definition. Its existence must be determined case by case, and that determination entails broad-based consideration of all the attendant circumstances. . . . .
> To work the calculus of reasonable suspicion in the context of a traffic stop, an inquiring court must ask whether the officer's actions were justified at their inception.

United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001) (citations omitted). See also United States v. Barnes, 506 F.3d 58, 62-63 (1st Cir. 2007) ("reasonable suspicion or even probable cause can be established by the 'collective knowledge' or 'pooled knowledge' principle" and "reasonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion"); United States v. Hensley, 469 U.S. 221, 230-32 (1985) (holding that an officer may rely on a police flyer or bulletin to justify an investigatory stop without having subjective knowledge of the facts, so long as the officials who issued the flyer had a reasonable suspicion based on articulable facts).

The testimony reflects that Corporal Lord was acting as the arresting officer at the behest of the Task Force and that the task force agents, particularly TFA Luce and Agent Zawadzki, had sufficient cause to support an investigatory stop and search of the Kinsella vehicle. Even if one accepts Kinsella's argument that Hitchcock's information was uncorroborated and inaccurate to some degree, it is apparent that the monitored phone calls indicated that Kinsella would be

arriving at a particular time from Canada and be bringing with him Oxycontin pills for purposes of an illicit exchange with Hitchcock. Kinsella makes much of the fact that Hitchcock was unable to identify a photocopy of Kinsella's driver's license photograph. I do not assign the same weight to that circumstance. The totality of the circumstances known to Luce and Zawadzki was more than sufficient to generate a reasonable suspicion that a drug deal had been arranged with Kinsella to take place that evening in Bangor, that Kinsella would drive to the deal in a green van with the New Brunswick plate, and that regulated substances destined for that deal would be in the van and in Kinsella's possession. The fact that Kinsella traveled into the United States in that very vehicle at the agreed upon time fully corroborated the information obtained in the Task Force's investigation. Thus, totally independent of the traffic infraction, Corporal Lord would have been justified in making an investigatory stop of the vehicle because there were specific facts that supported the investigatory stop.

B.  The warrantless search was authorized based upon the existence of probable cause to search the motor vehicle and any containers within it.

Kinsella argues that even if the court finds the initial investigatory stop to have been warranted, whatever reasonable suspicion the officers may have had simply evaporated when Corporal Lord saw Kinsella's mother in the van and both Kinsella and his mother provided Lord with a "legitimate" reason for their trip to Bangor. This is an unworkable theory. Investigating officers simply do not have to take at face value all of the assertions made by a suspect during a Terry stop. They need only support the steps taken during an investigatory detention with reasonable suspicion that criminal activity is afoot, based on articulable facts. Terry v. Ohio, 392 U.S. 1, 19-20 (1968) ("And in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether

8

it was reasonably related in scope to the circumstances which justified the interference in the first place."). The further detention and questioning at issue included the request that Kinsella exit his vehicle, the query whether he had any weapons or unlawful drugs in the vehicle, and the requests for his consent to search the vehicle to verify that such was the case. The elapsed time could not have been more than a very few minutes. It was not a lengthy roadside detention.

The Government's primary argument in support of the warrantless search of the vehicle is that the search was based on probable cause and a warrant was not required because of the so-called automobile exception. Maryland v. Dyson, 527 U.S. 465, 467 (1999) ("[T]he automobile exception does not have a separate exigency requirement: 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.'") (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996), and citing United States v. Ross, 456 U.S. 798, 809 (1982)). I agree with the Government that there was probable cause to believe that this green minivan would contain Oxycontin pills destined for a criminal transaction and, therefore, there was probable cause to search the van.

At the time of the stop and search, the task force agents had a specific van with a specific license plate, they understood that Kinsella used the van and had used it in connection with a previous deal with Hitchcock, they understood that the prior deal involved Canadian Oxycontin pills and that Kinsella was a Canadian resident, and they understood from monitored calls that Kinsella had agreed to meet Hitchcock that evening in Bangor to traffic 90 to 100 Oxycontin pills. Subsequent events transpired in accordance with the arrangement between Hitchcock and Kinsella. Kinsella entered the United States in the green van at the anticipated hour and, at the time of the stop, his travel route was consistent with having the Main Street, Bangor Burger King as a destination. Although Hitchcock evidently was not able to provide agents with a photo

9

identification, that fact alone does not negate the probable cause that the green van with New Brunswick plate GKK367 contained Oxycontin destined for drug trafficking.

C.  Even in the absence of probable cause, Corporal Lord obtained a valid consent to search the motor vehicle.

Kinsella's argument on the invalidity of his consent to search the motor vehicle is based upon his assertion that the officer's stop was not supported by probable cause and thus the length of the detention exceeded the permissible scope of a routine traffic stop. I reject this argument on two grounds. First, as I indicated above, the stop was supported by probable cause to believe that the motor vehicle would contain Canadian Oxycontin pills destined for drug trafficking, which justified a search of the vehicle. However, even if the stop and search was not supported by probable cause, reasonable suspicion existed to justify the initial stop and Corporal Lord then obtained a valid consent to search the vehicle.

The question of whether a consent to search was validly acted upon by an officer turns on the voluntariness of the consent. Voluntariness "is a question of fact to be determined from the totality of the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Consent is voluntary if the defendant's will was not overborne in the sense that he suffered a critically impaired capacity for self-determination. Id. at 225-26. The Government is not required to show that the person consenting to a search knew of the right to refuse consent in order to establish that the consent was voluntary, though knowledge of the right to refuse is a factor for consideration. Id. at 227. The government only bears the burden of proving the consent was voluntary. Florida v. Royer, 460 U.S. 491, 497 (1983).

With respect to Kinsella's consent to Corporal Lord's request to search the van, the facts of this case have a striking resemblance to the facts of Schneckloth v. Bustamonte. Corporal

Lord's interaction with Kinsella was essentially a "congenial" exchange that easily yielded a consent to search the vehicle, entirely in the absence of any factors suggesting that intimidation, coercion or duress impinged upon the voluntariness of Kinsella's acquiescence.  See Schneckloth, 412 U.S. at 220 (describing a "very congenial" exchange that yielded a valid consent to search a vehicle in the absence of probable cause to suspect any criminal activity). The Government's presentation supports a finding that Kinsella gave Corporal Lord a valid consent to search the van.

## CONCLUSION

For the reasons discussed above, the Government has presented evidence demonstrating that its initial stop of the Kinsella van was supported by probable cause and that the subsequent search of the van was supported by both probable cause and a valid consent.  I therefore RECOMMEND that the Court DENY the Defendant's Motion to Suppress (Doc. No. 83).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C.  636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 19, 2008